UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ROBERT LENARD BOOTH, a/k/a TREVOR
NICHOLAS, DANIEL T. WELLCOME JR.,
MICHAEL D'URSO, ANTONELLA
CHIARAMONTE, ALYSSA D'URSO, and JAY
GARNOCK

Defendants.

C.A. No. 1:22-cv-1115

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Robert Lenard Booth, a/k/a Trevor Nicholas, Daniel T. Wellcome Jr., Michael D'Urso, Antonella Chiaramonte, Alyssa D'Urso, and Jay Garnock (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      From at least April 2019 to December 2020, Michael D'Urso ("D'Urso") and Daniel T. Wellcome Jr. ("Wellcome") of Long Island, New York, laundered more than $8 million from at least 140 investors defrauded by overseas boiler rooms, including one operated by Robert Booth.  The boiler rooms defrauded their victims, many of whom were elderly or retirement-age, by selling fake investments that purportedly traded on U.S. exchanges.  Booth's boiler room alone received approximately $700,000 from at least 10 investors.

2.      Wellcome, who lived in the Philippines at the time, acted as the intermediary

1

between the boiler rooms and D'Urso, orchestrating the movement and disbursement of funds. Victims, who lived in both the United States and abroad, believed they were investing in publicly traded companies and wired their money to New York shell companies that D'Urso controlled through various nominees, including his daughter Alyssa D'Urso, his fiancée Antonella Chiaramonte, and his friend Jay Garnock. When investor money came in, D'Urso skimmed a portion for himself, Wellcome and his nominees, and wired the rest overseas to the boiler rooms. Chiaramonte, Alyssa D'Urso, and Garnock participated in the fraud by opening bank accounts for the shell companies and deceiving banks about the nature of their businesses. They also gave D'Urso online access to the accounts and dispersed funds at D'Urso's direction.

3.      By engaging in this conduct, as further described herein, Defendants violated and, unless restrained and enjoined by the Court, may continue to violate the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Action of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]. In the alternative, Chiaramonte, Alyssa D'Urso, and Garnock also aided and abetted D'Urso's violations. Additionally, Booth violated and, unless restrained and enjoined by the Court, may continue to violate the broker registration provisions of Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)], and Wellcome and D'Urso aided and abetted Booth's violations of that statute.

## VENUE AND JURISDICTION

4.      This Court has subject matter jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§77t(b) and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§§78u(d), 78u(e), and 78aa]. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, have made use of the means or instruments of

transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

5.      Venue is proper in this District pursuant to Securities Act Section 22 [15 U.S.C. §77v] and Exchange Act Section 27 [15 U.S.C. §78aa].  Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.  Many of the wire transfers from victims to shell companies under D'Urso's control were processed through correspondent and intermediary banks located in this District.  Additionally, Booth or those working at his direction told investors that they were representatives of an actual investment firm located in this District, and some investors were told that their money would be used to purchase securities traded on the New York Stock Exchange, which is based in this District.

## DEFENDANTS

6.      **Robert Lenard Booth**, a/k/a Trevor Nicholas, age 67, is presently under house arrest in Brooklyn, New York.  In 2019, Booth changed his legal name from Trevor Nicholas to Robert Lenard Booth.  In *U.S. v Booth*, 21 cr 652 (S.D.N.Y.), Booth was charged with conspiracy to commit securities fraud for operating a boiler room.  He recently resided and operated a boiler room in Thailand.  Rather than testify in connection with the Commission's investigation in this matter, Booth has executed an affidavit asserting his Fifth Amendment right against self-incrimination with respect to all matters relating to the investigation, including his communications with investors and Wellcome and his receipt of investor money.  Booth is not registered with the Commission in any capacity.

7.      **Daniel T. Wellcome Jr.**, age 50, resides in Hicksville, New York.  From approximately 2009 until February 2021, Wellcome lived overseas, most recently in the

Philippines.  He was arrested in February 2021 for his role in laundering money generated by various boiler rooms, including Booth's.

8.     **Michael D'Urso**, age 54, resided in Glen Cove, New York, during the events at issue in this Complaint.  D'Urso has not made himself available for testimony in connection with the Commission's investigation, despite his counsel's acknowledgment of receipt of the Commission's subpoena that required him to appear for testimony.

9.     **Antonella Chiaramonte**, age 35, resides in Glen Cove, New York.  She is D'Urso's fiancée and the nominee owner of ATC Holdings and Transfer Corp., an entity used in connection with laundering money on behalf of foreign boiler rooms.  Chiaramonte has not made herself available for testimony in connection with the Commission's investigation, despite her counsel's acknowledgment of receipt of the Commission's subpoena that required her to appear for testimony.

10.    **Alyssa D'Urso**, age 28, resides in Glen Cove, New York.  She is D'Urso's daughter and the nominee owner of BA Management Holdings Corp. and Irvine Management Transfers and Holdings Corp., two entities used in connection with laundering money on behalf of foreign boiler rooms.  Rather than testify in connection with the Commission's investigation in this matter, Alyssa D'Urso has executed an affidavit asserting her Fifth Amendment right against self-incrimination with respect to all matters relating to the investigation.

11.    **Jay Garnock**, age 75, resides in Kings Park, New York.  He is a friend of D'Urso and the nominee owner of DT Holdings Management Corp., an entity used in connection with laundering money on behalf of foreign boiler rooms.

## OTHER RELEVANT ENTITIES

12.     **ATC Holdings and Transfer Corp.** ("ATC Holdings") is a New York corporation created in August 2019.  Chiaramonte is the nominal owner of ATC Holdings.  ATC Holdings is a shell company.  It has no employees or operations.

13.     **BA Management Holdings Corp.** ("BA Management") is a New York corporation created in June 2020.  Alyssa D'Urso is the registered agent and nominal owner of BA Management.  BA Management is a shell company.  It has no employees or operations.

14.     **Irvine Management Transfers and Holdings Corp.** ("Irvine Management") is a New York corporation created in October 2019.  Alyssa D'Urso is the registered agent and nominal owner of Irvine Management.  Irvine Management is a shell company.  It has no employees or operations.

15.     **DT Holdings Management Corp.** ("DT Holdings") is a New York corporation created in August 2018.  Garnock is the nominal owner of DT Holdings.  DT Holdings is a shell company.  It has no employees or operations.

## FACTUAL ALLEGATIONS

### A. The Boiler Room Scheme

16.     Since at least 2019, a group of individuals operating in the United States and abroad has engaged in a scheme to defraud investors by purporting to sell securities and other investments and then to launder the proceeds of their fraud.  Investors were convinced to wire money that they believed would be used to purchase securities on their behalf, when in fact their money was simply divvied up by the fraudsters and never used for securities transactions.  Victims did not receive anything in exchange for their payments, though in many instances, fraudsters falsely represented that the value of a victim's initial "investment" had appreciated and induced the victim to make

even larger payments under the guise of making additional investments.  This type of fraud is commonly referred to as a "boiler room."

17.     The operators of the boiler room contacted investors by phone, email, or other means, and purported to represent various investment firms.  The operators typically used fake firm names that closely resembled the names of legitimate, regulated investment firms or simply used the names of actual investment firms that had no connection to the scheme.  The operators often directed the victims to professional-appearing websites to further the impression that they were agents of legitimate investment firms.

18.     Investors were instructed to wire money to New York bank accounts held by various shell companies that had been purposefully named to sound like transfer agents, financial services companies that keep records of the registered shareholders of companies that issue securities.  The shell companies had no legitimate operations and existed solely for the purpose of receiving and laundering the proceeds of the boiler room fraud.  The individual or individuals who controlled the bank accounts of the shell companies then divided the proceeds of the fraud among themselves and the boiler room operators abroad.

19.     In total, the boiler rooms at issue in this case fraudulently obtained at least $8 million from at least 140 victims.

**B.  Booth's Operation of a Boiler Room Fraud**

20.     From at least 2019 to 2020, Booth operated a boiler room with offices in Thailand and Panama.  Booth, directly and indirectly through individuals he controlled, contacted investors by phone and falsely claimed to represent legitimate investment firms, including Beekman Securities Inc., an investment firm that was until recently located in this District that has no affiliation with Booth.  Booth, directly and indirectly, instructed investors to wire money they

believed would be used for securities transactions to the accounts of shell companies located in New York. Booth's boiler room had at least 10 victims and defrauded them of approximately $723,770. This money was divided up among Booth, D'Urso, Wellcome and the nominees: when investor money came in to the accounts that D'Urso and his nominees controlled, D'Urso and the nominees would take a "fee" from themselves and wire the rest back to Booth's accounts overseas. Booth received at least $400,000 for his participation in the fraud.

21.     For example, on or around January 16, 2020, Booth or an individual working at his direction induced an investor to wire $85,000 to an account of ATC Holdings held at a major U.S. financial institution ("Bank 1") for the purchase of shares of securities. Booth knew or was reckless in not knowing that this money would not be used to purchase shares of securities but would instead be used to compensate Booth and others working with him. Booth also knew or was reckless in not knowing that instructing the investor to wire money to a shell company in the United States that had a name that sounded like a transfer agent would further the fraudulent scheme. The misrepresentation that the investor's money would be used to purchase shares of securities was material as it went to the fundamental purpose of the transaction. The $85,000 in investor funds were comingled with funds from other investors paid into the account. On or about January 24 and 27, 2020, D'Urso sent wires of $50,000 and $18,000, respectively, from the same ATC Holdings account to an account Booth owned and controlled in Thailand.

22.     Similarly, on or around November 19, 2020, Booth or an individual working at his direction induced another investor to wire $17,385 to an account of DT Holdings held at Bank 1 for the purchase of shares of securities. Booth knew or was reckless in not knowing that this money would not be used to purchase shares of securities but would instead be used to compensate Booth and others working with him. The misrepresentation that the investor's money would be

used to purchase shares of securities was material as it went to the fundamental purpose of the transaction.  The $17,385 in investor funds were comingled with funds from other investors (including other investors defrauded by Booth's boiler room) paid into the account.  On or about November 27, 2020, D'Urso sent a wire of $31,828 from the same DT Holdings account to an account Booth owned and controlled in Thailand.

23.     Booth further participated in the fraudulent scheme by coordinating with Wellcome to track investor money as it came into the shell companies.  Booth and Wellcome communicated by encrypted message to discuss money Booth was directing victims to wire to the accounts of shell companies and the amounts that Booth would receive from those transfers.

24.     For example, on or around July 21, 2020, Wellcome sent Booth a message asking if an investor's expected payment of $110,000 would be arriving soon.  Booth responded that it would arrive soon and that Wellcome should "Keep in book, on this Wed."  Wellcome responded on July 25, 2020 to tell Booth to have the investor send money to an account of ATC Holdings.  On or about August 6, 2020, Wellcome sent Booth a text message changing the instruction.  He told Booth not to direct the investor's money to ATC Holdings but rather to an account in the name of BA Management held at another major U.S. financial institution ("Bank 2").  Booth, directly or indirectly, conveyed that instruction, and the investor wired $109,975 to BA Management's account at Bank 2 on or about August 26, 2020.  By instructing the investor to wire money to this account, Booth knowing or recklessly participated in the fraudulent boiler room scheme.

25.     On or around October 29, 2020, Booth sent Wellcome a recorded voice message in which he asked "Is [a specific bank] still in the works because I have a guy going down for $160,000?" Booth was referring to an investor who wanted to purchase $160,000 in securities.  Wellcome responded with a recorded voice message stating, "No, I said [the specific bank] is not

still in play . . . DT Holdings, you got that information alright. I forwarded it over." Booth and Wellcome were knowingly or recklessly communicating regarding where to direct an investor to send money, specifically which shell company and bank account to use, in furtherance of the boiler room scheme.

**C. Wellcome and D'Urso's Participation in the Boiler Room Scheme**

26.     Wellcome and D'Urso each played a key role in the boiler room scheme.  Wellcome kept track of investor money and acted as a liaison between the boiler room operators and D'Urso. D'Urso, in turn, created the shell companies in New York and coordinated with Chiaramonte, Alyssa D'Urso, and Garnock to open and manage bank accounts in New York for the shell companies to receive investor money.  D'Urso then coordinated wire transfers back to Wellcome and the boiler room operators.  For their knowing or reckless participation in the scheme, these defendants each received a portion of the proceeds of the fraud.

27.     In 2019, Wellcome and D'Urso conspired to set up a money laundering operation for overseas boiler rooms.  Texts, phone messages, Wellcome's handwritten notes, and other documents reveal that Wellcome communicated directly with the boiler rooms, while D'Urso created the shell companies and recruited Chiaramonte, Alyssa D'Urso, and Garnock to create and manage bank accounts for them to receive investor money.  Wellcome and D'Urso agreed to split any money they received from the boiler room scheme between themselves and the individuals D'Urso recruited.

28.     D'Urso created names for the shell companies to sound like legitimate transfer agents or escrow companies in knowing or reckless furtherance of the fraud.  The names included ATC Holdings, BA Management, DT Holdings and Irvine Management.  None of these entities

ever conducted any legitimate business. They existed solely for the purpose of defrauding investors, which Wellcome and D'Urso knew or were reckless in not knowing.

29.    During 2019 and 2020, Wellcome and D'Urso knowingly or recklessly laundered over $8 million in investor money for approximately seven boiler room offices, including Booth's. The offices were located in Thailand, Cyprus, the Philippines and other countries. Wellcome and D'Urso each received a portion of the money that came in from swindled investors, and also provided a portion to Chiaramonte, Alyssa D'Urso and Garnock. D'Urso and Wellcome received at least $100,000 and $171,000 of investor proceeds, respectively, for their participation in the fraud.

**D. Chiaramonte's Participation in the Fraudulent Scheme**

30.    Between September 2019 and December 2020, Chiaramonte opened four bank accounts in New York in the name of ATC Holdings at Bank 1, Bank 2, and two other major U.S. financial institutions ("Bank 3" and "Bank 4"), in furtherance of the boiler room fraud. On the account opening documents for the account at Bank 4, which she opened on or around December 11, 2020, Chiaramonte misrepresented, at D'Urso's direction, that ATC Holdings' principal line of business was "Marketing Research and Public Opinion Polling." Chiaramonte knew or was reckless in not knowing that this representation was false. ATC Holdings, of which she was the president, engaged in no marketing research or public opinion polling. In fact, it had no business operations whatsoever; it was simply a vehicle used to launder investor funds.

31.    Chiaramonte knew or was reckless in not knowing that the accounts she created in the name of ATC Holdings were being used to further a securities fraud scheme. She had online access to ATC Holdings' bank account activity and/or received monthly bank statements reflecting wire transfers into the ATC Holdings accounts from abroad. The descriptions of these wire

transactions indicated that the deposits were intended to be used to purchase securities.   For example, ATC Holdings' October 2020 account statement from Bank 3 reflects an incoming wire transfer on October 14 in the amount of $3,498.  The description of the transaction includes the note, "investment/securities."  The same statement shows an incoming wire transfer on October 16 in the amount of $29,950.  The description of the transaction includes the note, "Airbnb IPO." ATC Holdings' account statements and activity also show that no incoming investor money was used to purchase securities or even for "marketing research" or "public opinion polling."  Rather, the account statements show that incoming investor money was almost immediately wired to accounts overseas and that Chiaramonte and D'Urso were paying themselves a portion of the incoming funds.  Chiaramonte received at least $92,000 of investor proceeds for her participation in the fraud.

32.   Chiaramonte was also aware from letters, bank statements, online account review and her calls to Bank 2 representatives that ATC Holdings' bank account at Bank 2 was under review by the bank for suspicious activity, and that the bank closed the account on or about September 11, 2020.

33.   Despite the indications that she was participating in a fraudulent scheme, Chiarmonte continued to assist D'Urso with the fraud until at least November of 2020.  Both D'Urso and Chiaramonte received investor proceeds in the form of checks or cash drawn from ATC Holdings accounts that were derived from investor funds.  She also wrote checks from ATC Holdings out of investor funds that were used to open up new bank accounts for other entities to further the fraud.  For example, on January 2, 2020, she wrote a check from the ATC Holdings account at Bank 1 in the amount of $14,500.  That money, drawn from investor funds, was used

to open and fund a new bank account for Irvine Management at Bank 1, to be managed by Alyssa D'Urso.

### E.  Alyssa D'Urso's Participation in the Fraudulent Scheme

34.     From October 2019 through July 2020, Alyssa D'Urso opened three bank accounts in New York – two for BA Management (at Banks 1 and 2) and one for Irvine Management (at Bank 1) – to assist her father's fraudulent scheme.  On or about October 10, 2019, Alyssa D'Urso opened a bank account in the name of Irvine Management at Bank 1.  When bank representatives asked her to describe Irvine Management's business activities, she falsely told them, at D'Urso's direction, that it conducted marketing and research.  When they asked for further detail, she texted her father how to respond, and he told her to say, "for real estate deals."  When they asked where the real estate was located, she again texted her father, who instructed her to respond, "Phillipines [sic] Malaysia Bangkok. New York and Florida."  Approximately 25 minutes later, she texted her father, "We might need another bank. . . . [One of the representatives is] getting so specific with information."   She subsequently had to ask her father whether Irvine Management was a C Corporation or an S Corporation, reflecting her unfamiliarity with the entity's organization and her true role as a nominee, not the president of a legitimate business.

35.     Alyssa D'Urso knew or was reckless in not knowing that Irvine Management did not provide real estate marketing and research services.  In fact, Irvine management had no real business at all.  She made this representation to the bank at her father's request to hide the true nature of Irvine Management's intended activities.  She thought she and her father might have to find another bank because she realized that their story would not withstand additional scrutiny as Irvine Management did not conduct the business she claimed it did.  D'Urso also knew or was

reckless in not knowing that Irvine Management did not provide real estate marketing and research services when he told his daughter to make that misrepresentation to bank representatives.

36.     Alyssa D'Urso had online access to BA Holdings and Irvine Management account activity and/or received monthly bank statements, which indicated that wires were coming into the accounts from investors for the purpose of buying securities.  For example, the February 2020 account activity for Irvine Management's account at Bank 1 reflected that on February 6 and February 27, 2020, it received wires of $18,744 and $24,994.  The descriptions of these wire transactions included the notes, "Nystx," and "Share Purchase Nystx," respectively, indicating that the deposits were intended to be used to purchase securities on the New York Stock Exchange. Similarly, on September 10 and September 29, 2020, the BA Holdings bank accounts at Banks 2 and 1, respectively, reflected that they received wires of $12,000 and $5,800 with an investor's name and notes that reflect "MRNA Buy" and "MRNA Shares."  Despite these indications, whenever money came into the accounts, Alyssa D'Urso assisted her father in wiring the bulk of the investor funds to various overseas entities, when she knew or should have known the funds were for the purchase of securities in the U.S.

37.     The bank account statements and/or online transaction activity that Alyssa D'Urso received and reviewed also show that no incoming investor money was used to purchase securities or even for "marketing research" or "real estate deals."  Rather, the account statements show that the money was almost immediately sent to accounts overseas and that Alyssa D'Urso and her father were paying themselves a portion of the incoming investor funds.  Alyssa D'Urso received at least $259,000 for her participation in the fraud.

38.     Alyssa D'Urso further assisted in the fraud by providing her father with access to the accounts she had opened so that he could wire money back to the boiler room operators.  For

example, on or about February 27, 2020, D'Urso texted Alyssa D'Urso that he wanted to send out a wire and said, "so when I do u give me the code they [the bank are] gonna text u." When she received the confirmation code from the bank, she relayed it to her father by text message so he could access the account and send the wire transfer.

39.     Alyssa D'Urso subsequently opened bank accounts for BA Management at Bank 1 and Bank 2 in July 2020. After Bank 2 froze its BA Management account due to suspicious activity, Alyssa D'Urso called the the bank to try to obtain information regarding when the freeze would be lifted. Alyssa D'Urso falsely claimed on that call that she had customers' and clients' funds in the account and that the bank's investigation was disrupting her business. She also indicated she had received wires, had multiple accounts open for her business, and had previously been in contact with the bank's fraud department.

40.     Bank 2 closed the BA Management account on or about October 2, 2020. In a letter sent to Alyssa D'Urso's home, which she received and subsequently shared with her father by text, the bank explained that it had frozen the money in the account until it could review the transactions associated with the account and validate the source of funds. Despite this red flag, Alyssa D'Urso continued to assist her father and participate in the fraud scheme.

41.     On or about October 7, 2020, D'Urso texted Alyssa D'Urso that he was locked out of Irvine Management's account at Bank 1 "because of suspicious activity." The next day, Alyssa D'Urso phoned Bank 1 at her father's request. She was unable to reach a representative and tried again on October 9. In a letter dated October 8, 2020 and sent to Alyssa D'Urso's home, Bank 1 notified Irvine Management that it had decided to close the account. Again, despite this red flag, Alyssa D'Urso continued to assist her father and participate in the fraud scheme.

42.     By November 2020, two of the three accounts Alyssa D'Urso opened at her father's request had been shut down.  On November 2, 2020, D'Urso texted Alyssa D'Urso, writing in part, "Also so you know I'm sending out final wires from the [BA Management Bank 1] account…." He subsequently texted, "And if there is any calls about wires from the bank we need to answer that will [free] up $ quicker… redirect the call to me say I'm office manager and can help with anything..give them my #."  Alyssa D'Urso responded, "Ok."

43.     The next day, Alyssa D'Urso spoke by phone to a Bank 1 representative who asked her for information about wire transfers to the account.  Alyssa D'Urso texted her father while she was on the phone to ask him for help answering the bank's questions.  D'Urso responded with the information she needed.  He also primed her to answer questions about BA Management's business, texting her, "Remember investments ranging from Realestate [sic] to merchandice [sic]." D'Urso and Alyssa D'Urso both knew or were reckless in not knowing that BA Management did not engage in legitimate investments in real estate or merchandise.

44.     Despite all of the indications that her father was participating in a fraudulent scheme, Alyssa D'Urso continued to share access codes with him until at least November 12, 2020. Both D'Urso and Alyssa D'Urso received investor proceeds in the form of checks or cash drawn from BA Management and Irvine Management accounts that were derived from investor funds.

## F.  Garnock's Participation in the Fraudulent Scheme

45.     On or around June 18, 2019, Garnock opened an account at Bank 1 in New York, in the name of DT Holdings.  On or around November 4, 2020, Garnock opened an account at another major financial institution ("Bank 5") in the name of DT Holdings.  Garnock, at D'Urso's direction, misrepresented to Bank 5 representatives in opening the account that DT Holdings managed real estate property, as reflected on the account opening documents.  Garnock knew or

was reckless in not knowing that this representation was false.  DT Holdings, of which he was the president, had no legitimate business activities.  His misrepresentation obscured the true nature of DT Holdings' anticipated activities, which was facilitating securities fraud.

46.     Garnock further assisted in the fraud by providing D'Urso with access to the accounts he opened on behalf of DT Holdings so that D'Urso could transfer money back to the boiler room operators.  He also provided his user names and passwords to D'Urso, so that D'Urso could also access the accounts and send out wires from them.

47.     Garnock had online access to and monitored the DT Holdings bank accounts. Garnock was aware, both from his viewing of account activity online and his text messages from D'Urso, that wires were coming into the accounts from investors for the purpose of buying securities.  For example, on August 26, 2019, D'Urso sent Garnock two text images showing a wire coming into the DT Holdings bank account at Bank 1 from an investor, containing the investor's last name and the words "Purchase Shares."

48.     From his online review of DT Holdings account activity and/or from his communications with D'Urso, Garnock knew or was reckless in not knowing that no incoming investor money was used to purchase securities or even for managing real estate property.  To the contrary, the account activity shows that the incoming investor money was almost immediately sent to accounts overseas and that Garnock and Michael D'Urso were paying themselves a portion of the incoming funds.  Garnock received at least $55,000 for his participation in the fraud.

49.     In the face of the indications that investor money received by the DT Holdings account was meant to be used to purchase securities, Garnock regularly assisted D'Urso in wiring the bulk of the investor funds to various overseas entities.  For example, on or about July 8, 2019, D'Urso sent Garnock a text message saying, "Good morning…if u get a text call me with code…

tks."  In investigative testimony before SEC staff, Garnock admitted that the code D'Urso was referring to was the code that would be texted or otherwise provided to him by the bank as part of its two-factor authentication.  Garnock also admitted that he shared such codes with D'Urso to allow D'Urso to wire money from the DT Holdings account that Garnock controlled.  Garnock was aware that he and D'Urso would be paid a portion of incoming investor money, and that D'Urso would wire the rest of the funds out of the country to multiple people or entities.  From this, Garnock knew or should have known that he was participating in securities fraud.

50.     Despite all of the indications that he was participating in a fraudulent scheme, Garnock continued to assist D'Urso with the fraud until at least November of 2020.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Against All Defendants)

51.     The Commission realleges and reincorporates paragraphs 1 through 50 as if fully set forth herein.

52.     Defendants, directly or indirectly, by use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

53.     By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Securities Act Section 17(a) [*15 U.S.C. § 77q(a)*].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Against Chiaramonte, Alyssa D'Urso, and Garnock)

54.     The Commission realleges and reincorporates paragraphs 1 through 50 as if fully set forth herein.

55.     Booth, Wellcome, and D'Urso violated Section 17(a) of the Securities Act [15 U.S.C. §§ 77q] by reason of their conduct described above.

56.     Chiaramonte, Alyssa D'Urso, and Garnock knowingly or recklessly provided substantial assistance that aided and abetted Booth, Wellcome, and D'Urso's violations.

57.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Chiaramonte, Alyssa D'Urso, and Garnock are liable for those violations.

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

58.     The Commission realleges and reincorporates paragraphs 1 through 50 as if fully set forth herein.

59.     By reason of the conduct described above, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly (1) employed devices, schemes, or artifices to defraud and/or (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (3) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

60.     By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Chiaramonte, Alyssa D'Urso, and Garnock)**

61.     The Commission realleges and reincorporated paragraphs 1 through 50 as if fully set forth herein.

62.     D'Urso violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by reason of their conduct described above.

63.     Chiaramonte, Alyssa D'Urso, and Garnock knowingly or recklessly provided substantial assistance that aided and abetted D'Urso's violations.

64.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Chiaramonte, Alyssa D'Urso, and Garnock are liable for those violations.

### FIFTH CLAIM FOR RELIEF
**Violations of Exchange Act Section 15(a)**
**(Against Booth)**

65.     The Commission realleges and reincorporated paragraphs 1 through 50 as if fully set forth herein.

66.     By reason of the conduct described above, Booth made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without registering with the Commission as a broker.

67.     By reason of the actions alleged herein, Booth violated and unless enjoined will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)] .

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 15(a)**
**(Against Wellcome and D'Urso)**

68.     The Commission realleges and reincorporated paragraphs 1 through 50 as if fully set forth herein.

69.     Booth violated Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)] by reason of his conduct described above.

70.     Wellcome and D'Urso knowingly or recklessly provided substantial assistance that aided and abetted Booth's violations.

71.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Wellcome and D'Urso are liable for Booth's violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)     finding that each Defendant violated the antifraud and registration provisions of the federal securities laws as alleged herein;

(b)     permanently enjoining each Defendant from violating Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder;

(c)     permanently enjoin Booth, Wellcome and D'Urso from violating Exchange Act Section 15(a);

(d)     permanently enjoin each Defendant against directly or indirectly participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent them from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

(e)     ordering each Defendant to disgorge all ill-gotten gains, plus prejudgment interest

thereon, wrongfully obtained as a result of their illegal conduct;

(f)     ordering each Defendant to pay civil penalties pursuant to Securities Act Section

20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and

(g)     granting such other relief to the Commission as the Court may deem just and proper.

Dated: February 9, 2022

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

S/ Melissa J. Armstrong
Melissa J. Armstrong*

*Application for admission *pro hac vice*
pending

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: (2020) 551-4724
armstrongme@sec.gov